**PAGES 1 - 44**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Joseph C. Spero, Magistrate Judge

JEFFREY KENT, et al.,           )
                                )
            Plaintiffs,         )
                                )
vs.                             ) **No. 3:25-cv-03660-JCS**
                                )
UNILEVER UNITED STATES, et al., )
                                )
            Defendants.         )
_____ )


San Francisco, California

Wednesday, November 5, 2025


**TRANSCRIPT OF PROCEEDINGS VIA ZOOM VIDEOCONFERENCE**


**APPEARANCES:**

For Plaintiffs:
            Gutride Safier LLP
            100 Pine Street, Suite 1250
            San Francisco, CA 94111
      BY:  **ANTHONY J. PATEK, ATTORNEY AT LAW**

For Defendants:
            DTO Law
            702 Marshall Street, Suite 640
            Redwood City, CA 94063
      BY:  **MEGAN O'NEIL, ATTORNEY AT LAW**


**REPORTED REMOTELLY BY:  April Wood Brott, CSR No. 13782,
Official United States Reporter**

**Wednesday - November 5, 2025**                                    **9:32 A.M.**

### R E M O T E   P R O C E E D I N G S

---o0o---

**THE COURTROOM DEPUTY:**  Good morning, Your Honor.  The United States District Court for the Northern District of California is now in session, the Honorable Joseph C. Spero presiding.

Just a reminder, these proceedings are being recorded. Any other recording, either by video, audio, including screenshots, further copying of the hearing is prohibited.

The first matter we're calling is Civil Case 25-3660, Kent, et al. versus Unilever United States, et al.

Attorneys appearing for this case, please use the raise your hand function at this time.

Please state your appearances for the record, starting with the plaintiff, and then the defendant.

**MR. PATEK:**  Good morning, Your Honor.  This is Anthony Patek from Gutride Safier appearing on behalf of Plaintiffs.

**THE COURT:**  Welcome.

**MS. O'NEIL:**  Good morning, Your Honor.  Megan O'Neil on behalf of Defendant, Conopco.

**THE COURT:**  Welcome.

Okay.  Thank you all.  I want to do the motion first, and then we'll get on to the case management portion of our agenda.

A couple of questions; then I'll give you a little -- a

tentative, and then we'll -- then you can say whatever you'd like about that.  The questions that I have are pretty straightforward.

The first is, I assume -- and this is a question for Plaintiffs' counsel -- that on the California statutory claims -- the CLRA, the UCL, and the FAL -- that the claims in this case are all governed by 9(b).  You agree with that?

There's nothing -- you addressed it in the -- in your briefing that these meet the requirements of 9(b).  So I assume that you agree that with respect to the claims under those statutes, which --

**MR. PATEK:**  I think --

**THE COURT:**  -- by the way, I think -- which I think is correct.

**MR. PATEK:**  I think that is true for the CLRA and the FAL, and it's true for the UCL, insofar as it's the fraud prong.

**THE COURT:**  But --

**MR. PATEK:**  I don't think that would be required for any UCL unfair prong -- well, yeah.  Or at least not for UCL unlawful prong, so for example, based on a violation of the Green Guides.

**THE COURT:**  Well, with the violation of the Green Guides isn't the violation that would -- I don't know that that would necessarily qualify under the UCL, but isn't the -- okay.

I see.  All right.

So is that the only carve-out, the unlawful based on the Green Guides?

**MR. PATEK:**  Yes.  I think so, Your Honor.

**THE COURT:**  Okay.  In terms of the omissions claims, you didn't articulate them in the complaint with any specificity.  You said some things about them in your briefing, which we can talk about if you want, but I'm just wondering whether you really want them, whether or not they're --

**MR. PATEK:**  Well --

**THE COURT:**  They're part of this case there.

**MR. PATEK:**  Well --

**THE COURT:**  They have a -- they're different than the straightforward claims you raise about making false statements more convoluted.  They're a little more convoluted, and the question -- and you don't articulate them the way you did in your briefing, in your -- so I'd certainly sustain the motion to dismiss.  But the question is whether you really want to deal with that.

**MR. PATEK:**  While I admit that they will probably end up taking a backseat to the -- you know, the CLRA and FAL and UCL claims in most of the discussion moving forward, I'm not willing to waive those at this point.

**THE COURT:**  Okay.  Then in order --

**MR. PATEK:**  And request -- like, if you feel that

they're not pled within enough specificity, I would request leave to amend to add some of the things that were perhaps better elucidated in the briefing.

THE COURT:  Well, let me ask you about that, because if you want leave to amend, you're going to have to give me justification for it.

In the briefing, you don't take the slightest opportunity to address why the definition of "naturally derived" is material to the central functioning of the product or relates to an unreasonable safety hazard.

How do you answer that requirement in order to have an omissions claim in California?

MR. PATEK:  Well --

THE COURT:  Under the LiMandri tests?

MR. PATEK:  -- I think we're operating under the assumption that because they're making an affirmative representation, they've created a duty to provide more information.

THE COURT:  Well --

MR. PATEK:  I believe --

THE COURT:  -- that's not by itself sufficient for an omissions claim in California.  Don't you also have to show clearly that the omission that they don't do, whether they made an affirmative representation or not -- so the affirmative representation is just one way of creating an obligation to

make a statement that you then omit.

It's not -- so the narrowing function of the omissions law and the case law around it is in the LiMandri decision and other decisions is you have to have a narrowing to something that is related to the central functioning of the product.  So it doesn't get trivial disclosures and then not so trivial omissions.

You have to have something related to the central functioning of the product or related to an unreasonable safety hazard.  Don't you agree with that, that that's the law?

**MR. PATEK:**  I would have to be honest, Your Honor.  That was not my understanding.  But I -- if you're saying that's the case, I would definitely go back and revisit that and look at that more closely.

**THE COURT:**  Okay.  That's fine.  You know, I'll give you the opportunity to do that.  My -- I'm skeptical that you can meet the requirements for an omissions case, but I'll give you leave to amend if you want to try it.

The -- and you can -- there are a series of questions that arise that you'll need to address like, you know, how can it be that a failure to make disclosures under the FTC Green Guides violates a California omissions law separate and apart from -- how can that be?

And where is the law that says that qualifies as a required -- as an obligation to disclose under California law

such that if you have an omission, it violates California law? I'm skeptical of that. Maybe you can come up with something that says it is, but you'll need to address that, and you'll need to address obviously all the requirements of the LiMandri decision and whether you really meet them, because the briefing on this was, shall we say, summary, based on there being very little in the complaint about it.

So go ahead. Amend if you feel it's appropriate. Don't amend if you don't feel it's appropriate. And then we'll take it up in the next round.

In terms of the affirmative claims, you know, we're in an interesting posture because the affirmative claims present a very similar question to those present in McWhorter. I'm not sure -- well, you know, if that case presents the question of the Ninth Circuit, I guess it's fully briefed now and will someday have argument. I assume that argument has not been set in that case. Is that everyone's understanding?

MR. PATEK: That is correct. The reply brief will be filed next Friday.

THE COURT: I see.

MR. PATEK: And then we presume that the briefing will be set after that.

THE COURT: Okay. And those -- that presents the front label back label issue that is presented in this case, at least part of it. And I am -- and to articulate that question,

it is whether or not in our case, the statements, which are very similar to the sort of natural origin, naturally derived issues raised in McWhorter -- whether or not there's an ambiguity that justifies under Ninth Circuit law going to the back label.

I've got to say -- you know, I think Judge Martinez-Olguin is one of the most brilliant judges I've ever met.  I think she's probably got it wrong on this one.  Who knows how the Ninth Circuit comes out.  I've never made any money betting on how they're going to come out in any case, especially since we don't know the panel.

But it seems to me that the correct analysis, from my perspective, at least my tentative -- and here's my tentative, is that that the plaintiffs have plausibly alleged that a reasonable consumer would understand "naturally derived" to mean nonsynthetic, that adding a percentage to this term doesn't make it ambiguous.  It makes it, if anything, more specific as to the alleged statement that is misleading or false.

It gives a specific percentage of nonsynthetic ingredients, and I don't think that there's support for the proposition, which is essentially what McWhorter's reasoning would lead to, that while "100 percent naturally derived" would be challengeable because it's unambiguously -- it has an unambiguously misleading interpretation -- and we all agree

that if there are multiple possible interpretations, but one of them can plausibly alleged to be unambiguously misleading, you don't go to the back label.

There's no support in the law for the idea that -- I don't think, 100 percent is different from 90 percent, which is what the McWhorter conclusion was.

In fact, the contrary, as I said, seems to be a more correct statement of the law. That is to say, these claims are at least as specific -- at least, if not more, specific than a claim that didn't have the percentage in there.

So I don't -- and of course, all the natural claims have been found to be nonambiguous, and you couldn't resort to the -- in the absence of an asterisk or something like that, to the rear. So, you know, that's where I come out on the tentative. I don't -- I think that there's -- I don't know what the Ninth Circuit's going to do with Judge Martinez-Olguin's decision. We'll find that out in a year. But for the moment, that's my tentative ruling.

Since you're on the short end of this, I'll turn to counsel for Defendants if you want to say anything.

**MS. O'NEIL:** I do, Your Honor. Thank you.

Your Honor, you focused largely on the percentage, which was neither the focus in McWhorter, nor our focus.

**THE COURT:** Well, that's incorrect, totally incorrect. At least as to McWhorter, she was very specifically focused on

the percentage.  She said that because there was a percentage, in part because there was a percentage, it was ambiguous, whereas if you had all or a hundred percent -- that would have one implication.  You wouldn't go to the back label.  But if you didn't have -- if you had 90 percent or 80 percent, well, that would imply things about the disclosure that entitled you to look at the back label.

So I think you're incorrect in that regard.  But my view is that the words that you used, "naturally derived" and a percentage, have plausibly a reasonable meaning for the ordinary consumer.  That's plausible.  Is that what you're contesting?

**MS. O'NEIL:**  Your Honor, so let me move away from McWhorter.  I'm focusing on different language in that decision.  But let's focus on this case because that's what's before Your Honor, and I agree that it makes more sense to focus on that.

The case that -- the language of the label and what we focus on and where the disagreement really is between the plaintiffs and Unilever is "naturally derived" does not mean natural.  And so to say "97 percent naturally derived" means 97 percent natural ignores the actual, very important language on the label, the word "derived" and the word "naturally."

So the plaintiffs are complaining that numerous ingredients, although they come from coconut oil, they were in

a lab and then processed, but that is consistent with the dictionary definition, the understanding of the word "naturally derived."  So it would be implausible and not reasonable to see "97 percent naturally derived" and conclude this is 97 percent natural.

And I'll add to that, Your Honor --

**THE COURT:**  So that's way too down in the weeds, right?  If you get right down into the question of facts, exactly how this does or does not constitute natural, then you lose your 12(b) motion because it's a factual dispute of the type that fits the paradigm for this kind of motion, which is judges almost never grant them because it's a factual dispute.

If you want to get away from a factual dispute and say "leaving aside the details," which there are going to be fights about, when you look at the name "naturally derived," I guess your point is that will never plausibly mean to a consumer natural or nonsynthetic.  It will never mean that.

**MS. O'NEIL:**  No.  It is not the law that it can never mean something to a consumer, because we would never win motion to dismiss, no defendant ever.

**THE COURT:**  But -- no.  Well, okay.  Fine.  It is not at all plausible, which doesn't mean it happens or that it's true or that most of the time, it's not plausible to allege that the reasonable consumer would believe that "naturally derived" means nonsynthetic.  That's what you're saying, right?

**MS. O'NEIL:**  What I'm saying, Your Honor, is that, having looked at the Ninth Circuit precedent, it is -- the McWhorter decision and the motion to dismiss were to be granted would be consistent with Ninth Circuit precedent, and here's why.

So the law is -- the plaintiffs and Unilever have a very different view of the law, as is not surprising to anyone, but the -- what it did not say is that any time you could view things differently, you lose a motion to dismiss.  What -- I should be specific.  That's not what Whiteside said, nor could it say that because it was a panel decision and not en banc, and that would be reversing prior decisions of the Ninth Circuit.

So McGinity and Moore come into play here, and they're very important, because, no.  Correct, Your Honor.  It is our position that a reasonable consumer could not conclude that the only meaning that yes, this is what it means, and I don't need any more information to conclude that.  And here is why Moore is important.

**THE COURT:**  So I have no idea how you get that as the standard.  It seems crystal clear in McGinity that they held specifically that having multiple meanings, even if one is consistent with the plaintiffs' version and one is consistent with the defendant's version, if the plaintiffs' version is plausible, you don't get to go to the reverse of the reverse

label.  Isn't that specifically -- they talk -- so there's language in those opinions about if there's two -- having two meanings, which is what you're saying.  There's two meanings.  One's yours.  One's theirs.  Having two meanings doesn't mean therefore, you get to go to the back label.  Right?  That's what it says.

        **MS. O'NEIL:**  Your Honor, I'm clearly not doing a good job of articulating my position.  So let me take a step back and try to explain what I'm saying.

    So the key to these decisions is whether or not the consumer would require more information before determining that's what it needs.  So I look at "97 percent naturally derived," and I say that absolutely means 97 percent natural.  Is that reasonable?  Or do I say, "I don't know what it means"?

    The plaintiffs have pled in their complaint that it is not known what that means.  There's multiple allegations that they say that the public does not know what Unilever is communicating.  They talk about there being multiple interpretations of what that could be, that it -- paragraph 79 talks about how it's much more confusing and nothing like a hundred percent natural, which is not confusing and is definitive.

    So the plaintiffs themselves have pled that it is subject to multiple interpretations and not, Your Honor -- and here's where the very nuanced -- and I spent a lot of time in these

cases, so I appreciate that this is -- that the language is very important here in the different cases and sort of following them through, which is why I want to talk about Moore.

But first, the key is here that the plaintiff -- it's not whether one -- if one person can look at it and say, "Yes, that's what it means.  I don't require any more information," the difference is does a reasonable consumer look and say, "I wonder if that means this or this?  I don't really know. I require" --

**THE COURT:**  So that's not correct.  That's a gloss on the case law.  I think you had it right when you said if a reasonable consumer looks at it and cannot understand its meaning.  If a reasonable consumer would look at this and would require more information before they could come to any understanding of the representation, that's the test.

And it seems to me that if -- in saying -- what you're saying is "naturally derived" -- and it can't be just because of multiple meaning.  That's insufficient.  Naturally derived, a reasonable consumer would always say, "I can't possibly -- I cannot -- I require other information because I can't reasonably understand what that means."

That's the point, I guess.

**MS. O'NEIL:**  "I can't reasonably conclude that it means 100 percent" -- sorry -- "97 percent natural ingredients

without further information."

And if I might, Your Honor, I would like you to point to why Moore v. Trader Joe's is so important here. So in Moore v. Trader Joe's, which had a 100 percent New Zealand Manuka honey representation, the Ninth Circuit said a reasonable consumer would necessarily require more information before determining that it was honey from 100 percent a single floral source.

And what they talked about were context clues. What else would tell you that? And this is an important -- in these cases, common sense and the consumer's experience come into play at the pleading stage, and it's found in all of these decisions.

We are not talking about something that you eat here. We are talking about -- and we are not talking about a stand at a farmers market. We are talking about Target, Walgreens, Safeway purchases by these plaintiffs who purchased things for $8 to $11. The idea that a reasonable consumer would conclude that 97 percent of what was in their $8 bottle of body wash is actually 100 percent natural is not reasonable.

So to do that, to say, "Is it really? I can't even -- it could mean multiple things. I'm going to look at the back label," because that is far-fetched, just like it would have been in the honey case.

And here, it's a stronger case because you look at the back, and it is well-articulated and explained exactly what

that means.

        **THE COURT:**  Okay.  I'll hear from the other side.

        **MR. PATEK:**  Thank you, Your Honor.

    First off, I'd like to say it's heartening to hear that somebody at least understands what our argument is.  I've been actually wondering, since Judge Martinez-Olguin's order, whether or not I was losing my mind because I really thought we had the better of it, and then of course, we were handed defeat.

        **THE COURT:**  Well, you may still be handed defeat in that case.

        **MR. PATEK:**  I'm sorry?

        **THE COURT:**  You may still have a defeat in that case, which will be --

        **MR. PATEK:**  That is a possibility.

        **THE COURT:**  -- much more far-reaching.

        **MR. PATEK:**  So a couple things to discuss with respect to whether or not to follow McWhorter.

    I would point out that part of the reason that I think Judge Martinez-Olguin might have ruled the way that she did is because of differences between that case and this one.  One is the fact that Whiteside didn't come out until after most of the briefing was done.

    So when the briefing on that case started, Procter & Gamble's theory had actually been the susceptible to two

meanings argument that was later, you know, rejected by Whiteside.  So even though Whiteside rejected that, I think the fact that's how it was initially presented may have colored her view.

And the other thing is the products in that case, of course, had the asterisks on the front labels with "naturally derived," and Judge Olguin -- Judge Martinez-Olguin, as you may know, since it sounds like you read that order very carefully, relied pretty heavily on the idea that if there's an asterisk, you simply cannot ignore the definition attached to it.

And so it became this sort of circular argument where the back label was deemed to confirm the front label representation because the definition was on the back label, right?  Which I think was an incorrect way to approach it.

THE COURT:  Well, I'm not sure that's actually what she did, because she clearly distinguished between the claims that had asterisks and those that didn't.  But, I mean, I understand the point.

MR. PATEK:  Yeah.

THE COURT:  Addressed, but you're not actually grappling with the argument raised by counsel.

MR. PATEK:  Sure.

THE COURT:  What about the honey case?

MR. PATEK:  So --

THE COURT:  The honey case is a very interesting case

because --

MR. PATEK:  So --

THE COURT:  -- it does -- because it's a case where there's a representation that the Court says could have three or four possible meanings, and a reasonable consumer would require that they needed more information before they could reasonably conclude that the representation was the one that might be a misrepresentation.

So what's the --

MR. PATEK:  Yeah.

THE COURT:  -- answer to that?

MR. PATEK:  So one of the things that I -- well, a couple of things that I find interesting about the Trader Joe's case, which are different from here -- so one, in that case, it's worth noting that there was also a purity grade that was on the front of the label that was a relatively low purity.  So that contradicted the understanding that it would be one hundred percent honey from Manuka flowers.

The other thing that I'm a little surprised doesn't get more discussion when people look back to that case is I believe that there was a regulatory definition, or an accepted definition, of Manuka honey that basically said to be Manuka honey, it just had to be primarily or a majority honey from Manuka flowers.

So there were inherent contradictions there in what was on

the front label and the way that those terms were commonly understood that were, I think, some of the main motivating factors in terms of why the Court felt that it was not reasonable to interpret it the way that the plaintiffs in that case did.

Here, in contrast, you know, there is nothing else on the front label that contradicts the normal understanding of a claim like "97 percent naturally derived."  I mean, contrary to opposing counsel's argument, we've submitted dictionary evidence that -- or, you know, citations to dictionaries, showing that the way that our plaintiffs interpreted the claims is in line with the way that dictionaries define those terms.

And I think one of the things that I really don't think any Ninth Circuit case law holds is that it's implausible to interpret a claim by its dictionary definition.  And so even if you look at McGinity, right, in that case, Procter & Gamble had actually submitted dictionary definitions for "nature" and "fusion," and they had argued in all the briefing below and at the oral argument that it was that word "fusion" that literally denoted the mixture of nature with something else that facially contradicted the idea that it was 100 percent natural and that that was one of the reasons why the specific claim or the specific theory of the case being forwarded there was implausible.

And that is actually some language that Whiteside, you

know, in one of the explications of McGinity, Whiteside actually says that it's about, you know, whether or not the particular representation that the plaintiffs are forwarding is plausible given the other information on the label.

THE COURT:  But it doesn't say, "given the dictionary definition."  I mean, you know, the fact that Procter & Gamble raised, as many parties raise and that you raise, the dictionary definition, doesn't mean that I look at the label, and then I go into the details of the dictionary definition and I go off of that, does it?

That that's enough to show that, rather than this being something from which a reasonable consumer cannot draw any inference without more information, it's made into an unambiguous and deceptive meaning?  At least one of the meanings is unambiguously deceptive because of the dictionary definition?

Does that --

MR. PATEK:  Well --

THE COURT:  Is there a court that says the opposite, that says, "Yes, you can look to the dictionary definition when you're trying to figure out the question of whether or not this representation actually has something that -- is something a reasonable consumer could draw any inference from"?

MR. PATEK:  There are definitely deceptive labeling cases where courts have referred to dictionaries.

THE COURT:  In the 12(b) context in this question of whether or not you can use it to decide whether it's ambiguous under California law?

MR. PATEK:  I thought so.  I would have to go back and double-check the cases to see whether or not they were 12(b)(6) as opposed to a motion for summary judgment.  But I know that dictionary definitions were submitted in McGinity.

THE COURT:  Well, submitted is just the thing, right?  I mean, it's what they do with them that matters.

MR. PATEK:  Well --

THE COURT:  People submit lots of things to me.

MR. PATEK:  -- fair enough.  But the opinion in McGinity, right, I mean, that was the portion of the opinion where the Ninth Circuit came in and said, "Look."  Like, "If we go in and read Nature Fusion, this could easily mean a mixture of nature with something else."

Now, I will grant you they did not specifically cite the dictionaries when they made that statement, but if you look at the development of the case in terms of the briefing below and even the oral arguments before the Ninth Circuit, I mean, that idea had definitely been introduced via the dictionaries.

I mean, you know, the briefing at the Ninth Circuit is getting into the dictionaries quite a bit in the McWhorter case.  So I guess we'll probably get some guidance on that when we get there.

THE COURT:  Maybe.  Maybe.

MR. PATEK:  So and then -- I'm sorry.

So just also to address one other thing that opposing counsel said, in terms of the supposed admissions in our complaint that this is actually ambiguous, that paragraph that she cites from the complaint, I would point out, first of all, that it -- I mean, granted, I mean, they disclosed -- they say that they've added emphasis, but they've added italics in their quotation of that paragraph to make it mean something that is different from what we were intending to communicate when we wrote it, right?

And in particular, you know, we had referenced -- what we were actually talking about was the fact that, you know, ISO 16128, which is the industry standard that -- you know, that we believe their back label definition is based on, is a guideline, but it doesn't actually require a specific mode of measurement.

And, you know, we were saying that when it's a hundred percent, then the unit of measurement doesn't really matter because it's always a hundred percent but that the percentages could vary slightly when you have a percentage less than a hundred percent.

Now, I would point out, this is -- this does not mean the consumer necessarily has to look to the back label because all that means is that the percentage is susceptible to two

meanings, and that's -- you know, Whiteside made clear that's not enough to require the plaintiff to look to the back.

But I also want to --

**THE COURT:**  Well, so but if they look to the back --

**MR. PATEK:**  And if they look to the back, there's nothing there that answers that question.

**THE COURT:**  Why does it need to answer that question? It says this is the -- this is what there is, and the fact that they use -- how is the fact that they used a challengeable way, the ISO 16128 method, or test, for how much is natural or not, how is that relevant?  When I'm looking at the back label and deciding whether or not -- if you go to the back label, that is to say --

**MR. PATEK:**  Yeah.

**THE COURT:**  -- if I were to conclude a reasonable consumer would not be able to draw an inference without going to the back label, I go to the back label, and I see their disclosures.  Why doesn't that take care of the problem regardless of what method they used for getting their numbers?

**MR. PATEK:**  Well, again, so what the law says is that the only time you consider the back label is --

**THE COURT:**  Ignore that.  Ignore that.  Say I disagree with you, and I say -- I'm not saying I'll do this.  But I want to focus just on the back label for the moment.  If I got -- if I conclude that you can't infer from "naturally derived" an

unambiguously misleading interpretation -- you can't, because of what counsel says, whatever it is, that the word "derive" makes it so that a reasonable consumer would need to know more information.  Okay?

Just on my hypothetical, you lose the first argument, and under Ninth Circuit law, they're entitled to consider what's on the back label in order to decide whether the whole label is misleading.  So you go to the back label, and it says what it says.  Why is it relevant that it's ISO 16128 in my consideration of whether that is a sufficient disclosure?

MR. PATEK:  Okay.  So first of all, I want to be clear, it's not -- I'm not arguing that it's relevant -- I just want to be very careful because I think we're getting mired in some details.  I'm not specifically saying that the fact that it's ISO 16128 is the problem.

What I'm saying is that the question that the consumer is looking to the back in this hypothetical to figure out the answer to is how was it measured.  And in cases like Brady and Whiteside, the Ninth Circuit's made clear that you only consider the back label if it confirms an understanding of the front label.  And --

THE COURT:  Well, but that's not correct, because there are some where -- well, it has -- and I'm not sure what that means because it's pretty clear also that you go to the back label where you couldn't draw an inference as to the

meaning from the front label.

MR. PATEK:  And --

THE COURT:  So if I can't draw -- so the question is what "derived" means, right?  That's -- that would be the question.  If one were to hold -- and obviously my tentative is I don't.

But if one were to hold that "derived," putting that in there means that a consumer looks at this and can't tell what it means, can't -- there's no plausible meaning that a reasonable consumer would understand from that, that it's like something that is not understandable, so they go to the back, and it's got this disclosure of what's in the product, which is more detail than on the front.  You know, it's not chapter and verse, but it's more detailed.

I assume that my decision about -- are you saying that in my decision about whether that is sufficient disclosure to mean that the interpretation that a reasonable consumer would come to would not plausibly be that this means 90 percent natural ingredients, 90 percent nonsynthetic, in deciding that question, I don't -- I have to consider whether ISO 16128 was used or not?  What relevance does it have to that question?

MR. PATEK:  So again, I want to be clear.  So I don't think you necessarily need to consider whether or not ISO 16128 was used to answer that specific question you just raised.

THE COURT:  Okay.

**MR. PATEK:**  But to me, that's where it gets into what is the ordinary -- and you have to look at the whole claim. It's naturally derived.  And naturally, in dictionary after dictionary, the ordinary meaning is in a natural manner or by natural growth from nature, right?  The key point being that it is not an artificial or synthetic process.

So, I mean, I'm not trying to get rid of the word "derived."  I'm just pointing out that that word, "derived," is in a claim that is two words, and the first word in that claim is "naturally," and you have to give that word effect.  And what that word does is it limits the derived to natural forms, right?  And then --

**THE COURT:**  Well, but if I --

**MR. PATEK:**  -- when we go to that --

**THE COURT:**  But if I buy that, then I don't get to the back.  If I buy that --

**MR. PATEK:**  That's right.  You don't get to the back because it's --

**THE COURT:**  So say -- but say -- okay.  So I reject that.  Say I reject that.  That's the hypothetical.  If -- and the question is if I look to the back, does that sufficiently disclose the product's content and derivation so that with this ambiguous front -- that's the hypothetical -- it's sufficiently disclosed now?

**MR. PATEK:**  I would still say no.  I still think that

it's too vague and that, you know, the references to changing up to 50 percent of the structure don't necessarily convey to an ordinary consumer who has no background in chemistry that those are actually, you know, ingredients that have been heavily modified.

I also think that it is -- if you take a much broader understand -- well, I guess if you absolutely have no idea what "naturally derived" means, then I don't know how the back label can confirm or contradict anything, right?

And this is -- I think Your Honor keyed in on something that is an interesting and important question, which is that in the original understanding of Williams and Brady, like, they really pretty much talked about referencing the back label to confirm or contradict an understanding that had already been formed based on the front label.

And in the last year or two, that has started morphing into a different idea, which is just does the back label clarify what the front label is supposed to mean, which is problematic, because, I mean, if it contradicts the front label, it still arguably clarifies what the front label means.

And I don't think that the Ninth Circuit really intended to move the law in that direction.  But because of the wording that they've used like -- right?  People are getting confused now and are beginning to wonder if any explanation that's put on the back is sufficient.

THE COURT:  Well, standing alone.

MR. PATEK:  Yeah.

THE COURT:  Meaning if you're looking at it, and you look at it, and standing alone, it is itself not misleading, then you lose the argument.  Isn't that the --

MR. PATEK:  Right.  But, again, how can it be misleading if it's not being compared to a belief that was formed before looking at it?

THE COURT:  Well, but that's absurd because you're doing that with the front label.  You're comparing the -- you're looking at and trying to decide whether some words are missing without having some preconceived notions or understanding based on anything on the product that you're comparing it to, so that's absurd.

MR. PATEK:  Well --

THE COURT:  You can look at the back label all by itself in the same way you could look at the front label all by itself.

MR. PATEK:  Okay.

THE COURT:  And say, "Look at the back label.  Is that misleading?"

MR. PATEK:  So I guess the way that I would reframe the question -- and this, I think, is maybe the clearer way to do it.

So let's assume that their explanation had been put on the

front label, right?  So, like, in Whiteside where they said "plant-based," and immediately below it, they put the statement "70 plus percent" --

THE COURT:  Sure, or asterisked it or something.

MR. PATEK:  Sure.  But again, the key is it's on the front label, right, so that it's all there when you first look at it, and that's how you interpret it all, all at once.

Like, in that situation, I think I would agree -- like, I don't think -- we wouldn't be here, right?  I wouldn't be suing them for misleading consumers because they would have been making things more clear right upfront.  I mean --

THE COURT:  So what you're saying --

MR. PATEK:  -- I think there would still be a contradiction between "naturally derived," as it's normally understood, and "naturally derived" -- but and I do think -- I mean, I don't know.  I think they'd still need to add the weight, and I think there still may be at that point you'd have a contradiction between the asterisk and the claim on the front label.

So yeah.  Actually, I take it back.  I don't know how you could put that on there without it being misleading unless you really have absolutely positively no meaning that you can attribute to the words "naturally derived."

THE COURT:  Okay.

MR. PATEK:  If you attribute anything close to their

ordinary meaning, then the back label contradicts that.  The back label --

THE COURT:  Well, but --

MR. PATEK:  -- is only not misleading if it isn't used in conjunction with the front label claim.

THE COURT:  Yeah.  So I don't think that's the way the analysis works.  I actually think you don't get to the back label unless you cannot plausibly allege that there is a definition that a reasonable consumer would come to on the front --

MR. PATEK:  Well --

THE COURT:  So if you don't get -- if there is no such thing, and that's the hypothetical, then you just look at the back and say, "Well, we can't tell what that means, so we have to look at the back and see what the status is with regards to this product, and if the back label is clear, then you're done."

I mean, I just don't -- I don't understand how it works the way you're talking, but -- and I don't think any of the case law says that.  But that's all right.  I understand what you're saying.  I understand what you're saying.

All right.  Let me hear from the defendant very briefly.  Go ahead.

MS. O'NEIL:  Very briefly, Your Honor.  Thank you.  I wanted to go back to what I was talking about at the

beginning.  I understand what Your Honor was focused on with the percentage, but what -- in the McWhorter decision, what we found important was the same argument that we made, which is what I'm going to focus on with my very brief time, which is the word "derived," "naturally derived," is not natural.

And that's what the McWhorter court said, which is Plaintiffs' theory relies on a sleight of hand that naturally derived ingredients are somehow -- and "natural origin" are somehow effectively identical to natural.  But that is not what the labels say, and plaintiffs are not free to excise or ignore words on the label to manufacture consumer -- customer confusion.

That's the same argument that we were focusing on, that Plaintiffs say over and over, "But everyone ordinarily understands this to mean natural."  That's just not true, and it's not reasonable, because words matter on a label, and just as manufacturers can find themselves in hot water over using the wrong language when they are careful to say "naturally derived" instead of "natural," that's important, and for courts to pay attention to.

And so what Plaintiffs want that to mean is that in its final form, it's natural.  But the word "derived" just in the English language, means in the beginning.  Where --

        **THE COURT:**  So that's not what when he said.  He didn't say, "In its final form, it's natural."  He didn't say

that.  He said he eschewed that, actually.  He said it means "naturally derived."

MS. O'NEIL:  Well, naturally -- to --

THE COURT:  That is, the process was natural, not chemical, or not synthetic.  The process.

MS. O'NEIL:  Well --

THE COURT:  The derivation was not, not that it's actually a natural product.

MS. O'NEIL:  Your Honor, there are, like, about 15 instances in the complaint and in the opposition where the plaintiff says the opposite, where the plaintiffs say it means not synthetic.

THE COURT:  Fine.  My job is to see whether or not there's a plausible reading.

MS. O'NEIL:  But Your --

THE COURT:  So would you please actually answer the question?

MS. O'NEIL:  So I'm sorry, Your Honor.  I didn't mean to not answer your question.

What I'm saying is that I don't think that is the plaintiffs' theory, but assuming it is -- or at least it wasn't the plaintiffs' theory.

If it's the plaintiffs' theory now that it means some sort of natural process, I don't think that's a reasonable reading.  And I don't even know what that means, meaning I'm having

trouble wrapping my brain around, as a consumer, what I would even think about if it's not coconut oil that's in there, what is happening?

And again, this is why Moore is important.  If the plaintiffs' theory is that there's no sort of laboratory involved in a mass-produced product that costs $10 at Target, that's just not reasonable.  What is happening?  I don't -- that's what I don't understand in the plaintiffs' theory and why I don't think it's reasonable for a consumer to determine, "This is what it means.  I don't require more information."

It means that Plaintiff has sort of alternate -- either everything in there is natural or 97 percent or 90 percent are natural in their final form, or they're not -- there's no synthetic process.  There's nothing chemical.  There's nothing in a lab.

Again, in the modern world, that just doesn't make sense.  There's --

**THE COURT:**  So in other words, what you're saying is that your client put on the label something that actually doesn't make any sense?

**MS. O'NEIL:**  No, Your Honor, not at all.

**THE COURT:**  Then why'd they use the word "natural" in it?  Why did they use the word "natural"?

**MS. O'NEIL:**  Thank you, Your Honor.  Good question.  Because derived from nature.  That's what "naturally derived"

means.  Naturally derived, derived from nature.

THE COURT:  So that means every single product that was ever manufactured by any company can always put "naturally derived" on it, right?

MS. O'NEIL:  Well, this is 97 percent naturally derived.  I --

THE COURT:  So every single company can put "X percentage naturally derived" on their product because all it means is the original ingredients were something that was found in nature?

MS. O'NEIL:  Well, Your Honor, a lot of the -- it would have to be true.  So --

THE COURT:  No, but that's my point, is the absurdity of your point is made by the fact that it's true with respect to everything.  Name for me a typical consumer product like these which is not derived from something in nature in the way that you say it is.  Name one.

MS. O'NEIL:  Okay, Your Honor.  I'll go with that.  So first of all, probably Clorox bleach I'm going to guess is not naturally derived.  I'm not a --

THE COURT:  No.  I think that's patently absurd.  I actually think that's wrong.  They take natural ingredients, and do things with them in a lab, and they come up with --

MS. O'NEIL:  Okay.  All right.  Well --

THE COURT:  So --

**MS. O'NEIL:**  -- you're exposing my lack of chemistry knowledge.  And I know that my opposing counsel is a master's in chemistry, so I take note.

But, Your Honor, the importance of putting "97 percent" is that in other products, it would be presumably less, and so you're -- and this is where it's 50 percent.  This is -- I do think it matters if you say 2 percent, 5 percent, 80.  This is why they were specific.

And I do believe this is what the judge was focusing on in McWhorter, is that, I mean, even here, you have one product that was 90 percent, another one that was 97 percent.  The company was being careful to note the percentage for the consumer.  So being precise about it.  Not saying "naturally derived" --

**THE COURT:**  Being precise about something meaningless though, because everybody --

**MS. O'NEIL:**  No, but Your Honor --

**THE COURT:**  Everybody does it.  Everybody does it.

**MS. O'NEIL:**  But, Your Honor, it's not meaningless. There are guides online that look at these various ingredients, and they are important to people if something comes from coconut oil and it's processed in a lab.  And again, we cannot ignore the realities of what the manufacturing process and preservatives are required.

So again, this isn't a farmer's market stand where

somebody could have, you know, 97 percent coconut oil and something else, but then it would probably say "97 percent coconut oil, not naturally derived."

And so that's why the explanation on the back explains what it means, the 50 percent -- I mean, I found that helpful. Again, I'm not a master's in chemistry, so I'm more reflective of the person looking in the grocery store. So when I see that it's unchanged, that 50 percent is retained -- I couldn't tell you if -- but I'm going to suspect that that 50 percent number would not apply to something that can, like, eat away at wood, right? Shampoo is very different and conditioner and things like that.

So I think that to the consumer, these things matter, and I think these sorts of decisions are just then everything comes off the label, and these things are important to people. That something came from coconut oil is important to people, and that's what that is denoting on the label. It has a meaning.

THE COURT: Okay. Well, thank you all. I think I've got enough on this.

Let's turn to the case management conference portion. I'm going to deny, in large part, the motion to dismiss except for some -- I'm going to give you an opportunity to amend on the omissions. I don't know that you actually want to do that. But I'll get out an order fairly shortly that will have all that.

I'm going to adopt all the dates you've got in your case management conference statement, meaning the specific dates, not the periods of time.  So you listed specific dates, and we'll put those both in the minutes and in the pretrial order. Obviously we're not scheduling a trial or pretrial yet.  We're just doing it through class certification, and we'll have a case management conference at the time of the certification hearing as well.

But my question for you is at what point in this process do you think that the parties are going to be in a position where they might be able to talk settlement?  And that's really a question mostly for the defendants.  That's the question for them.

**MS. O'NEIL:**  It's a good question that I would need to ask my client.  We were very hopeful that the case would be ending today, so I have not had that discussion with them.  So I'm confident, Your Honor, in our position.  So --

**THE COURT:**  Okay.  But you're going to lose.  But so the question is what --

**MS. O'NEIL:**  I am now aware --

**THE COURT:**  -- were you --

**MS. O'NEIL:**  Well, I can't -- we always talk -- I should say this:  I am -- in every class action I handle, I am open to discussing settlement.

**THE COURT:**  But that doesn't answer the question.  And

I would have expected you to be ready for this question, which is -- because some of these cases against your client in the past survived.  Some of them don't survive.  We could go on.

At what point in the process --

**MS. O'NEIL:**  Oh.  When --

**THE COURT:**  -- does your client like to talk settlement?

**MS. O'NEIL:**  Oh, sure.  At any time.  I'm saying I don't think we need to go through discovery to get to -- perhaps after the plaintiffs' depositions.  I mean, that part is often important, but, you know, right after, I'd say, early-stage discovery, we could absolutely talk settlement.

**THE COURT:**  What kind of discovery do you think has to happen before your clients will be in a position to consider potential settlement?

**MS. O'NEIL:**  The plaintiff -- I would need to take the plaintiffs' depositions first.  I think that would be the important piece of --

**THE COURT:**  And what do you need, from the plaintiffs' point of view, before you're going to be in a position to talk settlement?

**MR. PATEK:**  That was directed to me, Your Honor?

**THE COURT:**  Yes.

**MR. PATEK:**  Well, we are -- we actually were in actually pretty productive settlement discussions before the

McWhorter decision came out.  So we are happy to talk early on in the case.

That said, you know, the other sort of natural inflection point, if you're looking for a deadline to set for ADR or something like that, is right around the time of class certification.

Usually by the time the parties see what the class cert positions are and they have a feeling for the strength and likelihood that they'll get it certified or not, that's usually, you know, a key event that will drive willingness to settle.

I'm certainly willing to talk earlier than that, but if you're looking for a deadline or, you know, a target date, I think that's a pretty reasonable one.

**THE COURT:**  No.  I'm actually looking for something more refined and calibrated to this case.  When -- you know, some of these, because there's not sufficient -- because the case law's ambiguous enough or, for whatever reason, the facts are ambiguous enough, that we need to go through or to or about to or maybe even through class certification before the parties are going to be willing to compromise in a way that might lead to productive settlement conferences.

The question is in this case, is there -- can it be done before the class -- can it be done before that, with the provision of, you know, you can figure out what each side might

say about certification except for the fact that you may need some facts?  So the question is what facts one would need to have from the other side --

          **MR. PATEK:**  Okay.

          **THE COURT:**  -- in order to get to the point where you might have a settlement discussion, or is this the kind of case that I really need to set a deadline that's something like --

          **MR. PATEK:**  Yeah.

          **THE COURT:**  -- the class certification briefing or not?

          **MR. PATEK:**  So there are -- in terms of things we would get through discovery, I think the key things are I would need some evidence in terms of the marketing team, what they were thinking when they implemented the labels and whether or not there were good admissions there that support any punitive damages.

     The other thing would be sales data to know what the size and value of the class would be, you know, just to help frame the discussions, right?

     Then the other thing -- and this is not necessarily something to get from discovery.  This is, I think, more negotiation between the parties, is, you know, willingness to make label changes and, you know, what can be done on that front, because, you know, damages aside -- right? -- I mean, there's an ongoing harm, from our perspective, and so one of

the key things that's going to be an issue in settlement discussions is how to deal with that and what curative measures are going to be taken.

THE COURT:  Okay.

MR. PATEK:  That's not really a discovery thing. That's a settlement --

THE COURT:  No.  I appreciate that.  That, you'll get to that when you get to it with them, and I won't be involved in that discussion.  But you've answered my question, and I guess my -- is --

MR. PATEK:  Yeah.  I mean --

THE COURT:  Well, so here's what I -- what I don't want to be is cut short.  It sounds like this is the kind of case that's going to go to private mediation?  Is that the general feeling about it?

MS. O'NEIL:  Yes, Your Honor.

MR. PATEK:  That was our preference, yes.

THE COURT:  So, you know, to get on the calendar for some fabulous private mediator, you have to be ready to go, be able to identify that date, you know, six months in advance, sometimes longer.  And I don't want to get caught where we're at a point where the discussions should happen and we have to wait another six months to get the mediator.

So what I'd like you to do is have a conversation with your clients, have a conversation with each other, and file

something in a week, a joint statement that says, "What's the earliest date you both think that both sides will be ready for productive settlement negotiations --

        **MR. PATEK:**  May I make a minor request?

        **THE COURT:**  Well, let me get it out, and then you can make your request.

        **MR. PATEK:**  Sure.

        **THE COURT:**  So something on the timing.  And if you have a timing, the mediator you've agreed to.  And if I agree with it, I'll just set the time you want, and then you'll get a mediation date, and you'll tell me.

    But you were saying Mr. Patek, you had some --

        **MR. PATEK:**  So I just -- it's actually just a logistics issue.

        **THE COURT:**  Two weeks instead of one week?

        **MR. PATEK:**  Please, yes, because both --

        **THE COURT:**  Fine.

        **MR. PATEK:**  Yes.  Thank you.

        **THE COURT:**  You don't even have to justify it.  Two weeks.

    So you'll give me a joint statement, two weeks, saying when is the earliest date you reasonably want to have settlement discussions and select a mediator and tell me who it is.  So you'll have had to have cleared with them that they have something on their calendar, that they can deal with that

kind of a deadline, and then I'll just say that's your deadline, if -- unless I have some problem, and then we'll talk.

Let's set a case management conference, so I can see what's going on, in 90 days.

THE COURTROOM DEPUTY: That would be Wednesday, February 4th, Judge.

THE COURT: How does that work? It's at 2:00 P.M. with statements due one week in advance?

MS. O'NEIL: That works for me, Your Honor. Thank you.

THE COURT: And that's good for you, Mr. Patek?

MR. PATEK: Yes. Absolutely.

THE COURT: Okay. Great.

MR. PATEK: Yes.

THE COURT: All right. We'll do that. I'll get out the order. We'll -- and we'll just -- we'll keep proceeding, and, you know, we'll see what wisdom the Ninth Circuit gives us, but that's so far down the road, I'm not sure I want to stop anything for it. Pretty sure I don't want to stop anything for it. But we're not talking about setting a trial date yet, certainly.

Okay. Anything else you'd like to discuss?

MS. O'NEIL: No, Your Honor.

MR. PATEK: No, Your Honor.

**THE COURT:**  Okay.  Thank you.

**MS. O'NEIL:**  Thank you.

**THE COURT:**  All right.  We'll be in recess.

(The proceedings concluded at 10:31 A.M.)

---o0o---

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Monday, November 10, 2025

_____

April Wood Brott, CSR No. 13782