UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEFFREY KENT, et al.,

          Plaintiffs,

     v.

CONOPCO, INC.,

          Defendant.

Case No.  25-cv-03660-JCS

**ORDER GRANTING IN PART AND DENYING  IN PART MOTION TO DISMISS**

Re: Dkt. No. 14

## I.    INTRODUCTION

Plaintiffs in this putative class action assert claims against Conopco, Inc. ("Conopco"), a manufacturer of personal care products, based on statements on product labels that Plaintiffs contend are false and misleading.[1]  Presently before the Court is Conopco's Motion to Dismiss ("Motion").  A hearing on the Motion was held on November 5, 2025.  For the reasons stated below, the Motion is GRANTED in part and DENIED in part.[2]

## II.    BACKGROUND

### A.    The Complaint

Conopco is "focused on home and personal care products[.]" Compl. ¶ 18. It markets and sells a variety of shampoos, conditioners, and other bath products under the "Love Beauty & Planet," "Dove Men + Care," and "babyDove" brands (collectively, the "Products"). *Id.* ¶ 2; *see also id.*, App'x B (complete list of the Products). The front label of each of the Products contains a representation that a certain percentage of the product is "Naturally Derived." *Id.*  ¶ 31.  Although

---

[1] Although the Complaint also named Unilever United States, Inc. as a defendant, that defendant has been dismissed from the case.  Dkt. no. 12.

[2] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

1    the Naturally Derived claim appears in different locations on the front labels of the Products, it is

2    basically uniform in terms of size and format. *See id.,* App'x B.

3        There is no asterisk on the front label linking the claim to a definition elsewhere on the

4    front or back label; nor is there a definition of the term "Naturally Derived" on the front label. *Id.*

5    ¶ 32. However, on the back label "each [P]roduct typically includes a statement repeating the "X%

6    Naturally Derived" claim, and purporting to describe what 'naturally derived' means." *Id.* ¶ 33.

7    "For example, the back label of Love Beauty & Planet Plant-Based Vanilla Body Wash states:

8    '92% of our formula is naturally derived, meaning it's unchanged from nature or keeps over 50%

9    of its original structure after some processing. This includes water and ingredients from plant,

10   mineral and fermentation sources.' " *Id.* The Products also contain a list of ingredients on their

11   back labels. *See, e.g., id.* ¶¶ 43-44.  For some of the Products, "naturally derived ingredients" in

12   the list of ingredients are denoted with an asterisk. *Id.*  Plaintiffs allege that other Products do not

13   identify which ingredients are "naturally derived." *See, e.g.*, *id.* ¶ 49.

14       As to the Products that designate "naturally derived ingredients" with an asterisk, Plaintiffs

15   allege that the asterisked ingredient lists falsely or misleadingly identify synthetic ingredients as

16   naturally-derived. *Id.* ¶¶ 43-44, 54-59.  According to Plaintiffs, the misidentified ingredients

17    include cocoamidopropyl betaine, sodium lauroyl isethionate, sodium methyl cocoyl taurate lauric

18   acid, citric acid, and stearamidopropyl dimethylamine, cetearyl alcohol, and behentrimonium

19   chloride. *Id.* ¶¶ 44, 57. Plaintiffs allege that many of these ingredients, such as cocoamidopropyl

20   betaine and cetearyl alcohol, are non-naturally occurring chemicals made by chemically

21   modifying naturally-occurring plant oils. *Id.* ¶¶ 44, 53, 57, 59.

22       The Love Beauty & Planet website at https://www.lovebeautyandplanet.com includes a

23   page for each "Love Beauty & Planet" product and links to a "smartlabel" that is displayed via

24   smartlabel.com and/or the Smartlabel app. *Id.*  ¶¶ 45-46. According to Plaintiffs, the smartlabel

25   for each of the Products "describes specific ingredients as 'naturally derived[ ]' [but] does not

26   explain or define 'naturally derived[.]' " *Id.*  ¶ 46.

27       Plaintiffs allege that the "naturally derived" claims on the Product labels are false and

28   misleading because "the Products are predominantly composed of ingredients produced using

United States District Court
Northern District of California

industrial chemical processes." *Id.* ¶ 57. "For example, of the twenty (20) ingredients listed for the Dove Men + Care Eucalyptus and Birch 2-in-1 Shampoo and Conditioner, fourteen (14) are industrially-produced chemicals that most consumers would not identify as "natural" or "naturally derived," including one (citric acid) produced using industrial fermentation processes." *Id.* ¶ 58. Plaintiffs allege that "[s]imilar analyses hold true for all the 'X% Naturally Derived' Products." *Id.; see also id.* ¶ 60 ("[I]f one were assessing the '% naturally derived ingredients' by number of ingredients, at most 25% of the Essential Botanical ingredients are naturally derived").

Plaintiffs also allege that even if "one assumed the '0% Naturally Derived' claims are based on weight" the claims are false and misleading. *Id.* ¶ 59. According to Plaintiffs, "the claims would suggest to a reasonable consumer that the Products predominantly used natural ingredients obtained from natural sources with 'minimal processing' that exclude industrial chemical modifications." *Id.* For example, Plaintiffs allege:

> Given that two of the top three ingredients by weight for the "X% Naturally Derived" Dove Men + Care 2-in-1 shampoo and conditioner are "sodium laureth sulfate and behentrimonium chloride"—both of which are industrially-produced chemicals—the Product is, on information and belief, > 10% non-Naturally Derived ingredients by weight. In standard shampoo and conditioner formulations, these two ingredients alone constitute roughly 15% of the product's formula. Plus many of the remaining ingredients—e.g., sodium benzoate, dimethiconol, carbomer, TEA dodecylbenzenesulfonate, PPG-9, disodium EDTA, propylene glycol, and linalool—are also synthetic. Thus, the "90% naturally derived ingredients" claim is false. And even if it is not false, it is misleading, for the reasons described further below.

*Id.* "In other words, Defendant mischaracterizes industrial chemicals as Naturally Derived' in order to 'greenwash' the Products and make them seem safer and more environmentally friendly." *Id.* ¶ 63.

According to Plaintiffs, "Defendant's 'naturally derived' claims are based on the British Standards Institute's ISO 16128: 'Guidelines on technical definitions and criteria for natural and organic cosmetic ingredients and products.'" *Id.* ¶ 64. "This standard sets forth an algorithm for calculating the % of a product that is of 'naturally derived.' It defines 'derived natural ingredients' as 'cosmetic ingredients of greater than 50 % natural origin, by molecular weight, by renewable

carbon content, or by any other relevant methods, obtained through defined chemical and/or biological processes with the intention of chemical modification.'" *Id.*

Plaintiffs allege that ISO 16128 is a proprietary standard that is not available to the public and thus, "for all intents and purposes, the public is entirely ignorant of how [Conopco] calculates the percentage of ingredients that is naturally derived/natural origin and what [Conopco] is communicating when it makes the naturally derived/natural origin claims." *Id.* ¶¶ 65, 67. It further alleges that ISO 16128 "is not designed for use in labeling and product communications," as is expressly stated in the publication. *Id.* ¶ 68; *see also id.* ¶ 84 ("the BSI explicitly stated in the ISO 16128 publication that 'Neither ISO 16128-1 nor this document [i.e., ISO 16128-2] addresses product communication (e.g. claims and labelling), . . . characteristics of packaging materials or regulatory requirements applicable for cosmetics.'").

Plaintiffs allege that "ISO 16128's definition of 'natural origin index' is very complicated and entirely beyond the ability of an ordinary consumer to understand." *Id.* ¶ 69. It is not a government standard, but instead, "was designed solely by cosmetic industry scientists, without involvement of any consumer advocates or persons familiar with consumer advertising" with the apparent purpose of "provid[ing] an expansive definition [of] 'natural origin' to encourage manufacturers to use 'natural' materials as ingredients for manufacturing." *Id.* ¶ 72. Plaintiffs further allege that ISO 16128 is "inappropriate for use in labeling because it does not require uniform calculations." *Id.* ¶ 70. In particular, Plaintiffs allege:

> [I]t allows the party calculating the "natural origin index" (i.e., the % natural origin or naturally derived) to include or exclude added water, depending on the party's preference. Accordingly, the same product could have two different "% natural origin" indices (i.e., % naturally derived), depending on who calculated it. The standard is also ambiguous in that it defines "derived natural" ingredients as those of 50% or more "natural origin," measured by any of three criteria: "molecular weight," "renewable carbon content", or "any other relevant methods." But the standard does not define "renewable carbon content," nor what the "any other relevant methods" may be. Laypeople are not versed in assessing molecular weights either.

*Id.*

Based on the above allegations, Plaintiffs assert the following claims: 1) fraud, deceit and misrepresentation (Claim One); 2) violation of the Consumers Legal Remedies Act ("CLRA"),

California Civil Code §§ 1750, *et seq.* based on misleading statements and material omissions (Claim Two); 3) violation of California's False Advertising Law ("FAL"), California Business and Professions Code §§ 17500, *et seq.* based on misleading statements and material omissions (Claim Three); 4) negligent misrepresentation (Claim Four); and 5) violation of California's Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200, *et seq.* based on unfair, unlawful and deceptive trade practice (Claim Five).

**B.    The Motion**

In the Motion, Conopco asserts that all of Plaintiffs' claims fail as a matter of law. First, it asserts that Plaintiffs' false advertising claims under California law (Claims Two, Three and Five, asserted under the CLRA, FAL and UCL) fail to state a claim because no reasonable consumer would be deceived by any representation at issue. Second, it asserts that Plaintiffs fail to state a claim for fraud, deceit, and/or misrepresentation (Claim One) or negligent misrepresentation (Claim Four) because Plaintiffs have not plausibly alleged any actionable misrepresentation or omission by Conopco. Third, Conopco argues that Plaintiffs' claim for fraud, deceit, and/or misrepresentation (Claim One) fails for the additional reason that Plaintiffs have not plausibly alleged Conopco's knowledge of any falsity on the Products' labels. Finally, Conopco contends Plaintiffs' tort claims (Claims One and Four) are precluded as a matter of law by California's economic loss doctrine.

**III.    ANALYSIS**

**A.    Legal Standards Under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure**

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief can be granted. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a plaintiff's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

*United States District Court*
*Northern District of California*

1    In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and

2    takes "all allegations of material fact as true and construe[s] them in the light most favorable to the

3    non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

4    Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that

5    would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

6    1990). A complaint must "contain either direct or inferential allegations respecting all the material

7    elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v.*

8    *Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101,

9    1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

10   of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

11   (quoting Twombly, 550 U.S. at 555). "[C]ourts 'are not bound to accept as true a legal conclusion

12   couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S.

13   265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of

14   'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)

15   (alteration in original). Rather, the claim must be "'plausible on its face,'" meaning that the

16   plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable

17   inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S.

18   at 570).

19   Plaintiffs' claims that sound in fraud[3] must also meet the heightened pleading standard of

20   Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud must "be specific

21   enough to give defendants notice of the particular misconduct. . . so that they can defend against

22   the charge and not just deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp.*

23   *USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (superseded by statute on other grounds). To meet this

---

[3] At oral argument, Plaintiffs stipulated that their claims under the CLRA and FAL sound in fraud and therefore, that Rule 9(b) is the applicable pleading standard for those claims. Plaintiffs also stipulated that Rule 9(b) applies to their claims under the fraud prong of the UCL. Because the parties addressed all three claims under Rule 9(b)'s heightened pleading standard in their briefs, the Court does the same herein. The Court does not foreclose the possibility, however, that in their amended complaint Plaintiffs may be able to state a UCL claim under Rule 12(b)(6) based on "unfair" or "unlawful" conduct that does not sound in fraud.

1    standard, the plaintiff must include "the who, what, when, where, and how" of the fraud. *Id.*

2    Further, "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is

3    false." *Decker v. Glenfed, Inc.*, 42 F.3d 1541, 1548 (9th Cir. 1994).

**B.    The Reasonable Consumer Standard and Front and Back Label Claims**

5         Plaintiffs' claims under the UCL, FAL, and CLRA are governed by the "reasonable

6    consumer" standard, which requires that they "show that members of the public are likely to be

7    deceived." *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023) (quoting

8    *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (internal quotation marks and

9    citations omitted)). "The California Supreme Court has recognized that these laws prohibit not

10   only advertising which is false, but also advertising which, although true, is either actually

11   misleading or which has a capacity, likelihood or tendency to deceive or confuse the public."

12   *Williams*, 552 F.3d at 938.  Furthermore, advertising may be misleading because of affirmative

13   representations on the packaging or due to omissions.  *See, e.g., In re Trader Joe's Co. Dark*

14   *Chocolate Litig.*, 726 F. Supp. 3d 1150, 1167 (S.D. Cal. 2024) (finding that plaintiffs had stated

15   claims for false advertising based on lack of any disclosure on the defendant's products that the

16   products contained heavy metals).

17        The reasonable consumer standard "requires more than a mere possibility that the label

18   'might conceivably be misunderstood by some few consumers viewing it in an unreasonable

19   manner.'" *McGinity*, 69 F.4th at 1097 (quoting *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir.

20   2016) (quoting *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003))). "Rather, the

21   reasonable consumer standard requires a probability " 'that a significant portion of the general

22   consuming public or of targeted consumers, acting reasonably in the circumstances, could be

23   misled.' " *Id.* (quoting *Ebner*, 838 F.3d at 965).  " '[W]hether a business practice is deceptive will

24   usually be a question of fact not appropriate for decision on demurrer' under California law."

25   *Mattero v. Costco Wholesale Corp.*, 336 F. Supp. 3d 1109, 1117 (N.D. Cal. 2018) (quoting

26   *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008)).  "[O]nly in a 'rare situation'

27   can a court grant a motion to dismiss when a plaintiff claims that an advertisement is deceptive."

28   *Hernandez v. Radio Sys. Corp., No.* EDCV221861JGBKKX, 2023 WL 4291829, at *8 (C.D. Cal.

United States District Court
Northern District of California

1    May 10, 2023) (citing *Williams*, 552 F.3d at 939).

2    "Placing a disclaimer or a fine-print ingredients list on a product's back label does not

3    necessarily absolve a defendant of liability for deceptive statements on the front label." *Whiteside*

4    *v. Kimberly Clark Corp.*, 108 F.4th 771, 778 (9th Cir. 2024). For example, in *Williams v. Gerber*

5    *Products Co.*, the defendant's product was called "Fruit Juice Snacks" and displayed images of

6    various fruits on its front label. *Id.* (citing *Williams*, 552 F.3d at 936). "The product's side-label

7    ingredients list disclosed that it contained none of the pictured fruits and that the only fruit-related

8    ingredient was white grape concentrate." *Id.* (citing *Williams*, 552 F.3d at 936). The Ninth Circuit

9    in *Williams* reversed the district court's dismissal of the plaintiffs' UCL and CLRA claims,

10   disagreeing with that court's reasoning that "reasonable consumers should be expected to look

11   beyond misleading representations on the front of the box to discover the truth from the ingredient

12   list in small print on the side of the box." *Id.*

13   On the other hand, when "a front label is ambiguous, the ambiguity can be resolved by

14   reference to the back label." *McGinity*, 69 F.4th at 1099. In *McGinity*, the Ninth Circuit affirmed

15   the district court's dismissal pursuant to Rule 12(b)(6) of the plaintiff's false advertising claims

16   under the CLRA, FAL and UCL for failure to state a claim. *Id.* at 1095. There, the defendant's

17   product was a shampoo and conditioner called "Pantene Pro-V Nature Fusion" with the words

18   "Pro Fusion" in bold, capitalized letters on the front label, along with an image of an avocado on a

19   green leaf and a gold vitamin with the word "PRO V" on it. *McGinity*, 69 F.4th at 1095-96. "The

20   plaintiff argued that the label suggested the product was 'natural,' even though it was made with

21   synthetic ingredients." *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 779 (9th Cir. 2024)

22   (citing *McGinity*, 69 F.4th at 1096). The Ninth Circuit found that "the front label was ambiguous

23   because 'Nature Fusion' could mean 'that the products are made with a mixture of natural and

24   synthetic ingredients, that the products are made with a mixture of different natural ingredients, or

25   something else entirely.'" *Id.* (citing *McGinity*, 69 F.4th at 1098). The court therefore "looked to

26   the back label, which included, *inter alia*, an ingredients list featuring synthetic ingredients that 'a

27   reasonable consumer would not think are natural.'" *Id.* (quoting *McGinity*, 69 F.4th at 1099). The

28   court "concluded that the back label clarified the ambiguity on the front label and removed any

1    reasonable possibility that consumers would be misled." *Id.* (citing *McGinity*, 69 F.4th at 1098-

2    99).

3         The Ninth Circuit has also explained that "other contextual factors aside from the back

4    label can defeat claims that a product's label is misleading." *Id.*  For example, in *Moore v. Trader*

5    *Joe's Co.*, 4 F.4th 874 (9th Cir. 2021), the court found that honey labeled "100% New Zealand

6    Manuka Honey" was not "misleading, even though the product consisted of 'only between 57.3%

7    and 62.6% honey derived from Manuka flower nectar[]'" based on "three contextual factors [that]

8    were dispositive." *Id.* (citing 4 F.4th at 876).  The court in *Whiteside* described the contextual

9    factors in the *Trader Joe's* case as follows:

> "First and foremost," "given the foraging nature of bees, a reasonable honey consumer would know that it is impossible to produce honey that is derived exclusively from a single floral source," and "[a] reasonable consumer would not understand Trader Joe's label ... as promising something that is impossible to find." [4 F.th at 883]. Second, the relatively inexpensive cost of Trader Joe's honey would have "signal[ed] to a reasonable consumer that the product has a relatively lower concentration of honey derived from Manuka flower nectar." *Id.* at 884. Third, the front label displayed a "10+" denoting the honey's "relatively low" quality based on a well-known grading system used specifically for Manuka honey. *Id.* at 878, 884-85.
>
> In analyzing each of these factors, we noted that Manuka honey is "a niche, specialty product," and that buyers were "undoubtedly more likely to exhibit a higher standard of care than a parent walking down the dairy aisle in a grocery store, possibly with a child or two in tow, who is not likely to study with great diligence the contents of a complicated product package." *Id.* at 884. (internal quotation marks and citation omitted). A reasonable consumer of specialty honey would be aware not only of how honey is made, but also of the industry grading system and the fact that the purest Manuka honey typically costs around 20-times more than Trader Joe's. *See id.* at 878. These contextual factors defeated the plaintiff's claim that the front label was misleading. *Id.* at 881.

23   *Id.*

24        In *Whiteside*, the court revisited *McGinity* to clarify when it is appropriate to consider the

25   back label to determine whether the front label is misleading at the pleading stage of the case.  In

26   particular, it addressed the significance of the *McGinity* court's statement that "the front label must

27   be unambiguously deceptive for a defendant to be precluded from insisting that the back label be

28   considered together with the front label." *Id.*  at 780 (quoting *McGinity*, 69 F.4th at 1098). The

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

defendant argued that this meant "that a front label is ambiguous if it can have more than one possible meaning[,]" whereas the plaintiff argued that "a front label can be unambiguous for FRCP 12(b)(6) purposes even if it may have two possible meanings, so long as the plaintiff has plausibly alleged that a reasonable consumer would view the label as having one unambiguous (and deceptive) meaning." *Id.* at 780. The *Whiteside* court acknowledged that "*McGinity* [lent] some facial support to [the] [d]efendant's position" but concluded that that defendant's interpretation of that case was, nonetheless, "overly restrictive" and "inconsistent with [Ninth Circuit] precedent and that of California courts." *Id.*

The *Whiteside* court offered the following explanation for its reading of *McGinity*:

> Our reading of *McGinity* is consistent with the facts of that case and the sources on which we drew. We cited *Ebner*, which "consider[ed] the rest of the product's packaging when there was 'no deceptive act to be dispelled' on the front." *Ebner*, 838 F.3d at 966. The important fact in *Ebner* was not that the plaintiff failed to prove that the label's representations were deceptive, but that the label made no representation at all. Likewise, the front label in *McGinity*—featuring "Nature Fusion"—was so devoid of any concrete meaning that there was nothing "from which *any* inference could be drawn or on which any reasonable belief could be based about" the shampoo's ingredients. *Id.* (emphasis in original). In each case, a reasonable consumer would necessarily have required more information before concluding that the products' front labels were making a specific promise.

> This approach is consistent with California law, both as articulated by California courts and as interpreted in our prior decisions. . . . California courts have adopted our holding in *Williams* that "[y]ou cannot take away in the back fine print what you gave on the front in large conspicuous print." *Brady*, 26 Cal. App. 5th at 1172, 237 Cal.Rptr.3d 683 (citing *Williams*); see also *Skinner*, 53 Cal. App. 5th at 949, 267 Cal.Rptr.3d 869. Importantly, *Brady* applied this rule to a front label that was susceptible to two possible meanings, but it did not conclude that this rendered the label ambiguous. Considering the "One A Day"-branded vitamins, *Brady* acknowledged that some sophisticated consumers might not interpret "One A Day" literally and would inquire into the back label. *Brady*, 26 Cal. App. 5th at 1174-75, 237 Cal.Rptr.3d 683. But other reasonable consumers might take the front label at face value and assume that they needed to take only one vitamin daily. *Id.* Despite these two possible interpretations, the court ruled that the defendant was precluded from relying on the back label because the plaintiff had plausibly alleged that reasonable customers would see the front label as making an unambiguous representation. *See id.* Put another way, reasonable consumers would not necessarily require more information before concluding that they needed to take only one vitamin daily.

Defendant's interpretation of *McGinity* would effectively overrule *Williams* and *Brady*, something we did not and could not do as a three-judge panel of the Ninth Circuit. We cited *Williams* with approval throughout our opinion and did not mention *Brady*. *See, e.g., McGinity*, 69 F.4th at 1098. *Williams* and *Brady* require only that a front label be plausibly misleading for a plaintiff to survive dismissal, and *McGinity* did not hold otherwise. Contrary to Defendant's suggestion, our cases affirm that a front label is not ambiguous simply because it is susceptible to two possible meanings; a front label is ambiguous when reasonable consumers would necessarily require more information before reasonably concluding that the label is making a particular representation. Only in these circumstances can the back label be considered at the dismissal stage.

*Id.* at 780-81.

The court in *Whiteside* went on to apply these principles in determining whether the plaintiffs had plausibly alleged that labelling of the product in that case – baby wipes – was misleading.  The front label of the product used the words "plant-based wipes" (or "plant-based ingredients") and "natural care®" and had "nature-themed imagery." *Id.* at 774.  Some of the labels included an asterisk next to the words "plant-based wipes" with a corresponding qualifying statement ("*70%+ by weight") elsewhere on the front label; others contained no asterisk. *Id.* at 776. The plaintiffs alleged that the labels suggested that the wipes "contain[ed] only 'water, natural ingredients, and ingredients that come from plants and that are not subject to chemical modification or processing[]'" but that in fact, "the Products contain synthetic ingredients that do not come from plants and are subject to chemical modification or processing." *Id.*

The district court in *Whiteside* found that as to the unasterisked products, the list of ingredients on the back label, along with a disclaimer on the back label, would have made it clear to a reasonable consumer that the wipes contained both natural and synthetic ingredients. *Id.* at 777 (citing *Whiteside v. Kimberly–Clark Corp.*, Case No. 5:22-cv-01988-JGB-SP, 2023 WL 4328175, at *5 (C.D. Cal. June 1, 2023)). As to the asterisked products, the district court found that the front label was not misleading as a matter of law. *Id.* (citing 2023 WL 4328175, at *5). Citing to *Ebner* and *Trader Joes*, the district court "reasoned that when a product's front label is not 'unmistakably clear about the facet for which she seeks more information,' a reasonable consumer is expected to look to other features of the packaging, such as the fine print on the back label." *Id.* (citing 2023 WL 4328175, at *5). The Ninth Circuit, however, reversed in part, finding

1    that the plaintiff had plausibly alleged that the labelling of the unasterisked products (but not the

2    asterisked products) was misleading.  *Id.*  at 784-785.

3        With respect to the unasterisked products, the Ninth Circuit found that the district court

4    had erred in considering the back label based on its finding that the front label was ambiguous.  *Id.*

5    at 781-82.  The court observed that "[a] front label is not ambiguous in a California false-

6    advertising case merely because it is susceptible to more than one reasonable meaning."  *Id.*  at

7    782 (citing *Brady*, 26 Cal. App. 5th at 1174-75).  It went on to find that the district court had erred

8    in relying on *McGinity*, distinguishing the "plant-based" claims on the baby wipes front label in

9    *Whiteside* from the "all-but-meaningless marketing term 'Nature Fusion' in *McGinity*."  *Id.*  The

10   Ninth Circuit found that " 'plant-based,' together with the Products' allusions to 'natural care' and

11   nature imagery, plausibly suggests *some* representation about the contents of the package[,]"  in

12   contrast to the claims in *McGinity* and *Ebner*.  *Id.*

13        The Court of Appeals further found that the district court erred when it "cited *Trader Joe's*

14   for the proposition that a rational consumer who cares about what 'plant-based' means could look

15   to the back of the Product, which clarifies that it contains both 'natural and synthetic ingredients.'"

16   *Id.* (quotations and citations omitted). The Court of Appeals admonished that "front-label

17   ambiguity is determined not by whether a consumer 'could' look beyond the front label, but

18   whether they necessarily would do so."  *Id.*  (citing *Trader Joe's*, 4 F.4th at 882).  The court

19   further found that "the district court's reliance on *Trader Joe's* was . . . misplaced because of the

20   vastly different products at issue."  *Id.* In particular,  *Trader Joe's* involved a "niche specialty

21   product" and therefore a reasonable consumer of that product would be expected to exercise a

22   "higher standard of care than 'a parent walking down the dairy aisle in a grocery store, possibly

23   with a child or two in tow,' who is 'not likely to study with great diligence the contents of a

24   complicated product package.' " *Id.* (quoting *Trader Joe's*, 4 F.4th at 884 (citation omitted)). In

25   contrast, the plaintiff in *Whiteside* was "a parent without any specialized knowledge, purchasing

26   baby wipes for her young child."  *Id.*  The court noted, "*Trader Joe's* makes clear that consumers

27   of everyday items are not expected to study labels with the same diligence as consumers of

28   specialty products."  *Id.* It concluded that the plaintiff had "plausibly alleged that a reasonable

United States District Court
Northern District of California

1    consumer could interpret the front label as unambiguously representing that the Products do not

2    contain synthetic ingredients, and that a reasonable consumer would not necessarily require more

3    information from the back label before so concluding[,]" and that "[t]hese plausible allegations

4    preclude[d] Defendant's reliance on the back-label ingredients list" at the pleading stage of the

5    case.  *Id.*

6        The court in *Whiteside* went on to reject the district court's conclusion that as to the

7    unasterisked product, "the front label, standing alone, was not misleading as a matter of law."  *Id.*

8    The court found that a reasonable consumer could interpret the "plant-based" claims to mean that

9    the baby wipes were 100% plant-based, rejecting the district court's assumption that "'plant-

10   based' plainly means mostly, not necessarily all, derived from plants." *Id.*  at 783 (quoting 2023

11   WL 4328175, at *6).  It agreed with the district court, however, that as to the *asterisked* products,

12   the qualifying statement on the front label "70+% by weight" was sufficient to put the consumer

13   on notice "that there [were] qualifications or caveats, making it unreasonable to assume that the

14   Products were 100% plant-based."  *Id.*  at 785. Therefore, the Court of Appeals upheld the district

15   court's dismissal of the false advertising claims as to those products.  *Id.*

16        In *McWhorter v. Proctor & Gamble Company*, a case upon which Conopco relies heavily

17   in the Motion, the plaintiffs brought false advertising claims based on statements made on certain

18   shampoo and conditioner products sold by the defendant, namely, Herbal Essences "Real

19   Botanicals," Herbal Essence "Certified PurePlants," and Pantene "Essential Botanicals."  2025

20   WL 948061, at *1 (N.D. Cal. Mar. 28, 2025). The front label of these products "state[d] that a

21   certain percentage of the product [was] made from 'naturally derived ingredients' or [was] of

22   'natural origin.' " *Id.* (citing Compl. ¶¶ 29-30, 34-35, 41 and referring to these claims collectively

23   as the "Natural Origin Claims"). "The back panel of every shampoo and conditioner bearing

24   Natural Origin Claims include[d] text that provide[d] P&G's definition of 'naturally derived' or

25   'natural origin.' " *Id.*  For example, the "front label of Pantene Apricot & Shea Butter Conditioner

26   and similar products states '96% Naturally Derived** Ingredients[]' " while "the back label

27   explains what P&G means by the front-label statement: '**Natural source ingredients with limited

28   processing and purified water create this 96% natural origin shampoo. After processing, natural

source ingredients maintain ≥ 50% of their natural origin material.'" *Id.* (quoting Compl. ¶¶ 44-45).

The plaintiffs in *McWhorter* alleged that "contrary to P&G's statements, aside from water, natural oils, and natural fragrances, none of the ingredients are 'natural source ingredients,' nor made or derived using 'limited processing.'" *Id.* (citing Compl. ¶¶ 51-56). They further alleged that "[b]y defining 'natural source ingredients' as those which 'maintain ≥50% of their natural origin material' after processing, P&G obfuscates the fact that these 'natural source ingredients' are actually man-made chemicals, synthesized using industrial chemical processes." *Id.* (citing Compl. ¶¶ 52-82). According to the court, "[n]either Plaintiff appears to have read the explanations of the Natural Origin Claims that appear on each product they purchased: McWhorter does not mention the explanations at all, *see* Compl. ¶¶ 83-87, while Sharma alleges that he 'overlooked the asterisks and associated statement due to their small size[.]'" *Id.* (citing Compl. ¶ 91). The court further observed that the plaintiffs did "not allege that they performed any analysis or testing of the Products before filing their Complaint." *Id.*

Citing *McGinity* and *Whiteside*, the court in *McWhorter* concluded that "the Natural Origin Claims are ambiguous such that a reasonable consumer must review the back label for additional information about the meaning of the Natural Origin Claims." *Id.* at *6. The court reasoned:

> The Products' front labels state that a certain percentage of the product – less than 100 percent – is made from "naturally derived ingredients" or is of "natural origin." . . The labels' provision of a percentage, combined with "naturally derived" or "natural origin," communicates to the consumer that the product is not all natural or at least raises enough ambiguity that the consumer must review the back label for more information about the product composition. As in *McGinity* and *Whiteside*, a reasonable consumer would need more information to understand the meaning of such claims. Like in *McGinity*, the front label Natural Origin claims represent "that something about the product bears a relationship to nature," but did "not promise that the product is wholly natural," unlike a "label declaring that a product is '100% natural' or 'all natural.'" . . . 69 F.4th at 1098.
>
> Plaintiffs' theory about the misleading nature of the Natural Origin Claims at issue thus hinges on a sleight of hand: that "naturally derived ingredients" and "natural origin" are somehow "effectively identical" to "natural." See Opp. at 8. But that is not what the labels say, and Plaintiffs are not free to excise or ignore words on the label to manufacture customer confusion. As the Ninth Circuit explained in

United States District Court
Northern District of California

> *Whiteside*, "the presence of an asterisk alone puts a consumer on notice that there are qualifications or caveats, making it unreasonable to assume" that "naturally derived" and "natural origin" are "effectively identical" to "natural." *Whiteside*, 108 F.4th at 785. The asterisks present on the labels here signal to a reasonable consumer that they must look to other parts of the product label to understand the full explanation of the label's statements. And because the back label sufficiently explains what P&G means by the front label's claim that a certain percentage of the product is made of "naturally derived ingredients" or is of "natural origin," Plaintiffs fail to establish that the product labels were false or misleading. *See, e.g.*, Compl. ¶ 47 ("**Natural source ingredients with limited processing & purified water create this 90% natural origin shampoo/conditioner. After processing, natural source materials maintain ≥ 50% of their natural origin material").

*Id.* at *6-7.

The court in *McWhorter* rejected the plaintiff's assertion that the Natural Origin Claims were "unambiguously deceptive because courts have held that claims like '100% natural' or 'all natural' plausibly exclude any synthetic ingredients." *Id.* at *7. The court reasoned:

> [T]he product labels here do not make those claims; they claim that some specific percentage of the Product (e.g., 90%) is made from "naturally derived ingredients" or is of "natural origin" and then proceed to define those terms elsewhere on the label. Plaintiffs' reliance on a supposed "mountain of precedent" interpreting the phrases "100% natural" or "all natural" is unhelpful, as it reads the words "derived" and "origin," as well as the qualified percentage, out of the labels at issue. A reasonable consumer may not ignore the labels' actual wording or substitute another claim that the Product labels never made.

*Id.* The court went on to find that "[n]one of Plaintiffs' proposed interpretations render the Natural Origin Claims false – whether Plaintiffs interpret the Natural Origin Claims to be based on weight, volume, the number of ingredients, the percentage " 'extracted directly from plants,' or the percentage excluding 'industrial chemical modifications,' the labels explain what P&G means by the front-label percentage statements." *Id.* The court therefore concluded that the plaintiffs' claims failed the reasonable consumer test as a matter of law because "members of the consuming public are unlikely to be deceived by any affirmative representations on the packaging of P&G's Products" and "consumers may not introduce their own interpretation of a statement on a product label by selectively reviewing a portion of a label to the exclusion of the same label's clarification of the statement[.]" *Id.*

15

C.     **Whether Plaintiffs Plausibly Allege that Conopco's Labelling Would Mislead a Reasonable Consumer**

Plaintiffs' false advertising claims require that they plausibly allege that representations or omissions on Conopco's product labels would be misleading to a reasonable consumer.  For the reason set forth below, the Court finds that Plaintiffs' allegations are sufficient to meet that standard based on misrepresentations alleged in the Complaint.

As a preliminary matter, the Court must decide whether the back label of the Products should be considered in determining whether Plaintiffs have plausibly alleged that the packaging of the Products is misleading.  Resolution of this issue turns on whether Plaintiffs have "plausibly alleged that a reasonable consumer would view the label as having one unambiguous (and deceptive) meaning," that is, that the front label is "plausibly misleading[,]" or if, instead, "a reasonable consumer would necessarily have required more information before concluding that the products' front labels were making a specific promise."  *Whiteside*, 108 F.4th at 780-81.  The Court finds that the front label is "plausibly misleading" and therefore, that consideration of the back label of the Products is not appropriate.

As discussed above, Plaintiffs have alleged that a reasonable consumer would understand from the phrase "x% naturally derived" that the specified percentage of the product, whether evaluated by weight or by the number of ingredients, is made of ingredients that are not synthetic but that in fact, because of the inclusion of synthetic ingredients in the *definition* of "naturally derived" used by Conopco, the percentage of the product that is made from synthetic ingredients is much higher than the label suggests.  In other words, a reasonable consumer would believe that by describing products as "x% naturally derived," Conopco is making a specific (and inaccurate) representation as to the percentage of each product that is non-synthetic.  The crux of the issue, then, is whether it is plausible that a reasonable consumer would believe that "naturally derived" means non-synthetic.  Numerous courts have found that it is and this Court agrees. *See, e.g., See Kutza v. Williams-Sonoma, Inc.,* 2018 WL 5886611, at *1 (N.D. Cal. Nov. 9, 2018) (finding that as a matter of pleading, reasonable consumer standard was adequately alleged where product label stated "active ingredients derived from natural sources" even though "products in fact contain[ed] 'unnatural, synthetic, and/or chemical ingredients[ ]'" and rejecting the defendant's argument that

plaintiffs' claims failed as a matter of law because "a reasonable consumer would understand the claim of 'natural' only applied to the active ingredients and/or that 'derived from natural sources' is not the equivalent of a representation that the product only contains 'natural' ingredients, active or inactive.")); *Gregorio v. Clorox Co*., 2018 WL 732673, at *1 (N.D. Cal. Feb. 6, 2018) (holding that false advertising claims were adequately alleged as to the defendant's cleaning products that were described as "naturally derived" where it was alleged that the plaintiffs understood that this term "meant that the product was a natural product that did not contain any synthetic or non-natural ingredients" whereas the products actually contained "synthetic and non-natural ingredients"); *Shank v. Presidio Brands, Inc.,* 2018 WL 510169, at *1 (N.D. Cal. Jan. 23, 2018) (holding that the plaintiff adequately alleged that reasonable consumers would be misled by product label stating that the product "contain[ed] only naturally derived ingredients" where the products actually "contain[ed] numerous ingredients that [were] artificially-engineered through multiple synthetic processes rendering the resulting ingredients and its components unnatural and not naturally-derived" and rejecting the defendant's argument that the product list on the back label ensured that consumers would not be misled on the basis that "reasonable consumers should not be 'expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box.'") (citing *Williams*, 552 F.3d at 939)).

Conopco attempts to distinguish these cases on the basis that "none of the labels in those cases featured a qualified percentage or an explicit, on-label definition of 'naturally derived.'" Reply at 8. But the definition of "naturally derived" on Conopco's products is on the back label and is not appropriately considered at the pleading stage if the plaintiff has plausibly alleged that claims on the front label are unambiguously deceptive, as the Court finds Plaintiffs have done here. The Court also rejects the suggestion that merely adding a percentage to a "naturally derived" claim renders it non-misleading as a matter of law. While it is true that in some cases, such as *Whiteside*, qualifying language indicating the percentage of the product that was plant-based was enough to establish that a reasonable consumer would not be misled by the packaging claims, that was because of the plaintiffs' theory of the case. In particular, in *Whiteside* the

plaintiffs asserted that the packaging was misleading because reasonable consumers would understand that the product was made *entirely* of plant-based ingredients. *See Whiteside*, 108 F.4th at 774 ("Plaintiff claims that the words 'plant-based wipes' (or 'plant-based ingredients') and 'natural care®' on the front label, together with the nature-themed imagery displayed on the packaging, suggest that Defendant's baby wipes contain only 'water, natural ingredients, and ingredients that come from plants and that are not subject to chemical modification or processing'" whereas "[t]o the contrary, the Products contain synthetic ingredients that do not come from plants and are subject to chemical modification or processing."). That is not Plaintiffs' theory here, however, and the Court finds nothing in the Ninth Circuit or California case law that suggests a reasonable consumer could not be misled by a claim about the percentage of a product that is non-synthetic where the claim is false.[4]

Conopco also argues that the Court should consider the back label of the Products to determine whether Plaintiffs' allegations are sufficient because under California law, "'ambiguity' is not limited to situations in which a front label contains 'all-but-meaningless marketing terms' that are 'devoid of meaning.'" Reply at 4 (citing *Whiteside,* 108 F.4th at 780). To illustrate this

---

[4] In *McWhorter*, the court *did* adopt the reasoning advanced by Conopco here, stating:

> Plaintiffs contend that the Natural Origin Claims are unambiguously deceptive because courts have held that claims like "100% natural" or "all natural" plausibly exclude any synthetic ingredients. Opp. at 7-8. But the product labels here do not make those claims; they claim that some specific percentage of the Product (e.g., 90%) is made from "naturally derived ingredients" or is of "natural origin" and then proceed to define those terms elsewhere on the label. Plaintiffs' reliance on a supposed "mountain of precedent" interpreting the phrases "100% natural" or "all natural" is unhelpful, as it reads the words "derived" and "origin," as well as the qualified percentage, out of the labels at issue. A reasonable consumer may not ignore the labels' actual wording or substitute another claim that the Product labels never made.

2025 WL 948061, at *7. The undersigned does not find this reasoning to be persuasive as it suggests that only claims that a product is *entirely* natural or naturally derived can be unambiguously deceptive whereas a claim that only a specific percentage of the product is naturally derived is, as a matter of law, ambiguous and by necessity requires the consumer to scrutinize the back label. The Court finds nothing in the California and Ninth Circuit case authority that supports such a result, however. Indeed, in *McGinity*, the Ninth Circuit found that the term "Nature Fusion" was ambiguous because the front label did "not make any affirmative promise about *what proportion of the ingredients are natural*." 69 F.4th at 1098 (emphasis added). Furthermore, the court's focus on the word "derived" as a source of ambiguity appears to be in conflict with the many cases in which courts have found plausible the allegation that reasonable consumers understand the term "naturally derived" to mean non-synthetic.

18

1  point, it cites to the *Trader Joe's* case, in which the court observed that there was "some ambiguity

2  as to what '100%' means in the phrase, '100% New Zealand Manuka Honey.'" 4 F.4th at 882. The

3  court explained, "100% could be a claim that the product was 100% Manuka honey, that its

4  contents were 100% derived from the Manuka flower, or even that 100% of the honey was from

5  New Zealand." *Id.* Thus, the court found, a reasonable consumer would "necessarily require

6  more information before they could reasonably conclude Trader Joe's label promised a honey that

7  was 100% derived from a single, floral source." *Id.*

8      Conopco's argument is unpersuasive. *Whiteside* makes clear that a label may be

9  ambiguous (and require the consumer to read the back label) not only where it uses meaningless

10  marketing terms but also where it makes no claim at all. 108 F.4th at 780. Thus, for example, in

11  *Trader Joe's*, while there was no meaningless term, like Nature Fusion, on the front label, there

12  also was no claim whatsoever as to the specific percentage of the product that was made from the

13  nectar of Manuka flowers so a reasonable consumer could not draw *any* inference on that subject

14  from the claims on the label. As a result, the court found that the phrase "100% Manuka honey"

15  did not suggest a single unambiguous (and deceptive) meaning. The facts in that case are not

16  analogous to the facts of this case, however, where Plaintiffs allege that Conopco has made an

17  affirmative representation that reasonable consumers are likely to interpret as making a false claim

18  about the percentage of synthetic ingredients in its products. Furthermore, this case involves

19  everyday products and not the niche product at issue in the *Trader Joe's* case that resulted in a

20  higher standard of care from the reasonable consumer. Therefore, *Trader Joe's* does not support

21  Conopco's position.

22      The Court further concludes that even if the statements on the back labels of the Products

23  are considered, they do not resolve any ambiguity that might render the statements on the front

24  label non-misleading. Plaintiffs have plausibly alleged that the definition on the back label is

25  based on a standard that is unsuitable for advertising, would not be understood by a typical

26  consumer of Conopco's Products and encompasses synthetic ingredients, contrary to the

27  expectations of a reasonable consumer of the Products. It is well-established that "[y]ou cannot

28  take away in the back fine print what you gave on the front in large conspicuous print." *Brady v.*

*Bayer Corp.*, 26 Cal. App. 5th 1156, 1172 (2018) (citing *Williams* generally).  Thus, "a back label that [does] not *confirm* what was on the front label" cannot defeat a California false advertising claim at the pleading stage if the front label makes a misleading claim.  *Id.* at 1168 (citing *Williams*, 552 F.3d at 939).

Here, Plaintiffs have plausibly alleged that reasonable consumers would understand that synthetic ingredients are not "naturally derived."  Thus, the back-label definition is essentially "fine print" that undercuts the statements on the front labels.  Therefore, the statements on the back label do not establish as a matter of law that the labelling of the Products is not misleading, as Conopco contends. The Court notes that while the court in *McWhorter* appears to have reached a contrary conclusion, it does not explain why the statements on the back labels in that case (which also allegedly relied on the ISO 16128 standard to define terms used on the front labels of the products) would *as a matter of law* dispel any ambiguity associated with the front label claims.

The Court concludes that even if it were appropriate to consider the back label of the Products, whether the back label would dispel any misconceptions related to the front label claims presents a questions of fact.  *See Sultanis v. Champion Petfoods USA Inc.,* No. 21-CV-00162-EMC, 2021 WL 3373934, at *11 (N.D. Cal. Aug. 3, 2021) ("even assuming a reasonable consumer read the disclaimers [on the back label] identified by [the defendant], it cannot be concluded as a matter of law that the substance of the disclaimer would be sufficient to disabuse the consumer of any misconceptions engendered by the [front-label representations.") (internal quotations and citations omitted).   In sum, to the extent Plaintiffs' false advertising claims are based on claims made on Conopco's Product labels, the Court finds that this is not one of the "rare cases" where it is appropriate to dismiss those claims at the pleading stage under the reasonable consumer standard.

### D.     Omissions

Defendants contend Plaintiffs have failed to plausibly allege their false advertising claims based on omissions, asserting that the "stray references to purported omissions" in the complaint are insufficient to meet the heightened pleading standard under Rule 9(b) that applies to Plaintiffs' false advertising claims.  The Court agrees.

1    "Omissions may be the basis of claims under California consumer protection[ ] laws, but

2    'to be actionable the omission must be [1] contrary to a representation actually made by the

3    defendant [a "partial omission"][;] or [2] an omission of a fact the defendant was obliged to

4    disclose [a "pure omission"].' " *Hodsdon v. Mars, Inc*., 891 F.3d 857, 861 (9th Cir. 2018) (quoting

5    *Daugherty v. Am. Honda Motor Co*., 144 Cal. App. 4th 824, 835 (2006));  *see also Hayden v.*

6    *Bob's Red Mill Nat. Foods, Inc*., No. 23-CV-03862-HSG, 2024 WL 1643696, at *9 (N.D. Cal.

7    Apr. 16, 2024).

8        A "defendant only has a duty to disclose when either (1) the defect at issue relates to an

9    unreasonable safety hazard or (2) the defect is material, 'central to the product's function,' and the

10   plaintiff alleges one of the four *LiMandri* factors." *Hammerling v. Google LLC*, 615 F. Supp. 3d

11   1069, 1085 (N.D. Cal. 2022) (quoting *In re Toyota RAV4 Hybrid Fuel Tank Litig*., 534 F. Supp. 3d

12   1067, 1102 (N.D. Cal. 2021)). "The *LiMandri* factors are (1) the defendant is in a fiduciary

13   relationship with the plaintiff; (2) the defendant had exclusive knowledge of material facts not

14   known to the plaintiff; (3) the defendant actively conceals a material fact from the plaintiff; or (4)

15   the defendant makes partial representations but also suppresses some material facts." *Id.* at 1085

16   (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997)).

17       In their Opposition, Plaintiffs assert that the "primary omission is an accurate and non-

18   misleading definition of 'naturally derived' with an explanation of the basis of the claimed

19   proportion, placed on the front label in proximity to the 'X% Naturally Derived' claim."

20   Opposition at 23.  Apparently relying only on a pure omission theory, they assert that the second,

21   third and fourth *LiMandri* factors support their omission claims because "[t]hese are materials

22   facts in Conopco's sole possession, were actively concealed by it, and exemplify a case where a

23   defendant makes a partial representation while suppressing material facts."  *Id.* They further assert

24   that "Conopco has a duty to disclose this information to comply with the FTC Green Guides."  *Id.*

25   (citing Compl. ¶ 69, purportedly citing 16 C.F.R. § 260.1).  Conopco argues in its Reply brief that

26   Plaintiff's theory is "simply a rearticulation of its misrepresentation theory" and points out that

27   paragraph 69 of the Complaint does not, in fact, discuss its obligations under 16 C.F.R. § 260.1.

28       As a preliminary matter, Plaintiffs' omission claims are not alleged with any specificity

United States District Court
Northern District of California

and the theory of the claims offered in Plaintiffs' opposition brief is not set forth in the Complaint. For this reason alone, the claims are insufficiently pled. Furthermore, Plaintiffs do not explain in their briefing why they have adequately alleged either that the omission "relates to an unreasonable safety hazard" or is "material" and "central to the product's function[,]" which is a separate requirement apart from the *LiMandri* factors. Nor have they explained how failure to make disclosures required under the Green Guides fits into the legal tests California courts apply to omission claims. Therefore, to the extent that Plaintiffs claims are based on alleged omissions, the Court dismisses Plaintiffs' claims with leave to amend.

### E.    Allegations Based on Information and Belief

Conopco contends Plaintiffs' claims are insufficient because "[i]n California, private litigants are not permitted to bring consumer protection claims predicated on the absence of evidence." Motion at 17 (citing *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096–97 (9th Cir. 2017)). Thus, Conopco contends, Plaintiffs must point to evidence that directly conflicts with the claimed misrepresentation. *Id.* at 17-18 (citing *Engel v. Novex Biotech, LLC*, 2015 WL 846777, at *4 (N.D. Cal. Feb. 25, 2015), aff'd, 689 F. App'x 510 (9th Cir. 2017)). Conopco asserts that this standard is not met because "Plaintiffs do not allege any specific facts to corroborate their theory of falsehood, i.e., facts that 'directly conflict[] with the claim,'" instead only alleging on information and belief that "Conopco simply overrepresented the percentage of the Products that are 'naturally derived[.]'" *Id.* at 18. This argument is unpersuasive.

As a preliminary matter, Conopco's reliance on *Kwan* is misplaced. That case explained that under the UCL and CLRA, "private plaintiffs, unlike prosecuting authorities, do not have the power to require defendants to substantiate their advertising claims, and that private plaintiffs, like prosecuting authorities, have the burden of proving that the marketing claims are false or misleading." 854 F.3d at 1094-95 (citing *National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.*, 107 Cal.App.4th 1336, 1344 (2003)). Plaintiffs here do not assert claims based on lack of substantiation but instead, allege that Conopco's marketing claims are false and misleading and that Plaintiffs relied upon those claims and were thereby injured.

Conopco is also incorrect to the extent it suggests that Plaintiffs cannot satisfy their

22

pleading burden based on allegations that are made on information and belief. "The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations and quotation marks omitted)). Therefore, Plaintiff need not allege details related to the composition of Conopco's Products in support their claims as the specific composition of the Products is proprietary and unavailable to Plaintiffs. *See id.* (citing *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) ("[W]e relax pleading requirements where the relevant facts are known only to the defendant.")). Nor are Plaintiffs required to allege specific facts showing that their allegations that Conopco's claims are false have been confirmed by testing of the Products. *Scheibe v. Fit Foods Distribution, Inc*., No. 23-CV-220 JLS (AHG), 2023 WL 7434964, at *12, 14 (S.D. Cal. Nov. 8, 2023) (holding that "Rule 9(b) does not supplant the requirement that the Court '[a]ssum[e] the truth of [Plaintiff's] allegations and construe[ ] them . . . in the light most favorable to [Plaintiff]' " and concluding that "trial or summary judgment, not a motion to dismiss, are the proper vehicles to contest the veracity of Plaintiff's factual allegations or criticize the quality of Plaintiff's evidence.") (quoting *Davidson v. Kimberly-Clark Corp*., 889 F.3d 956, 964 (9th Cir. 2018)).

Plaintiffs have included detailed factual allegations in the complaint identifying the advertising claims that are alleged to be misleading as well as specific factual allegations showing why these claims are misleading. These include specific factual allegations about why Conopco's reliance on the ISO 16128 standard is improper, *see, e.g.,* Compl. ¶¶ 64-77, and allegations identifying synthetic ingredients in the Products that Plaintiffs contend make up a substantial portion of the Products by weight and significantly more than Conopco's marketing claims suggest. *See, e.g.,* Compl. ¶¶ 53-59. At this early stage of the case, that is all that is required. Therefore, the Court rejects this argument.

**F.    Knowledge of Falsity**

Conopco asserts that Plaintiffs' claim for common-law fraud (Claim One) fails to state a

23

United States District Court
Northern District of California

1   claim for the additional reason that Plaintiffs have not alleged specific facts showing Conopco

2   knew any representation was false at the time it was made.  Motion at 19 (citing *Lazar v. Super.*

3   *Ct.*, 12 Cal. 4th 631, 638 (1996)).  While scienter is an element of fraud, however, it need not be

4   pled with particularity under Rule 9(b), which expressly provides that "[m]alice, intent,

5   knowledge, and other conditions of a person's mind may be alleged generally."  Fed.R.Civ.P. 9(b).

6   Plaintiffs' allegations are sufficient to meet that standard.  In particular, they have included

7   extensive allegations related to Conopco's use of the British Standards Institute's ISO 16128

8   standard to justify its "naturally derived claims" even though that standard "uses a Byzantine

9   method to calculate 'naturally derived'" to misleadingly characterize synthetic chemicals as

10  "naturally derived" and despite "clear instruction not to use the standard for labeling claims or

11  advertisements" in the ISO 16128 publication, which Conopco "has deceptively chosen to do[.]"

12  Compl. ¶¶ 7-8;  *see also id*. ¶¶ 64-77.  Plaintiffs also allege throughout the Complaint that

13  Conopco knew that its claims were misleading and that it was engaging in "greenwashing."  *See,*

14  *e.g., id.*  ¶¶ 12, 63, 114.  These allegations are sufficient to raise a plausible inference that

15  Conopco knew that the claims on its Products were false or misleading.  Therefore, the Court

16  rejects this argument.

17        **G.    UCL Claims**

18         Plaintiffs assert their UCL claim under all three prongs of the statute – the fraudulent

19  prong, the unlawful prong, and the unfair prong.  *See*  Compl. ¶¶ 153-162.  In the Motion,

20  Conopco challenges Plaintiffs UCL claims on the single ground that "Plaintiffs have not alleged

21  an actionable misrepresentation or omission" and all three UCL claims are "based on the same

22  alleged conduct."  Motion at 18 n. 5.  For the reasons stated above, the Court finds that Plaintiffs'

23  have adequately alleged actionable misrepresentations and therefore have stated a claim under the

24  fraudulent and unlawful prongs of the UCL.

25         As to the unfair prong, Plaintiffs point to their allegations in the Complaint that Conopco's

26  conduct violates FTC regulations and policy set forth in the Green Guides.  Opposition at 24

27  (citing Compl. ¶ 69); *see also* Compl. ¶¶ 153-162.  Although Conopco argues in a conclusory

28  manner in its Reply that the Green Guides do not apply to the claims on its Products and that those

claims are, moreover, consistent with the Green Guides, Reply at 13, these issues were not raised in the Motion and therefore the Court declines to consider these arguments here.

### H.    Economic Loss Rule

Conopco contends Plaintiffs' common law fraud and negligent misrepresentation claim fail to state a claim under California's economic loss rule. The Court agrees.

"The economic loss rule provides: [W]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only 'economic losses.' " *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004) (internal quotations and citations omitted). "The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." The Court in *Robinson* went on, however, to recognize exceptions to this rule: "Tort damages have been permitted in contract cases where a breach of duty directly causes physical injury [citation]; for breach of the covenant of good faith and fair dealing in insurance contracts [citation]; for wrongful discharge in violation of fundamental public policy  [citation]; or where the contract was fraudulently induced. [Citation.]" *Id.* at 989-990 (internal citations omitted).  The Court further explained that "[f]ocusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated.  . . . If every negligent breach of a contract gives rise to tort damages the limitation would be meaningless, as would the statutory distinction between tort and contract remedies." *Id.*  at 990 (internal quotations and citation omitted).

In *Robinson*, the court "distinguished between two acts by the defendant, finding that one act was a breach of contract, and the other was fraudulent conduct—independent of the breach— that put the plaintiff's physical safety at risk." *Strumlauf v. Starbucks Corp.*, 192 F. Supp. 3d 1025, 1035 (N.D. Cal. 2016) (citing *Robinson*, 34 Cal. 4th at 991).  "While *Robinson* held that the economic loss doctrine did not bar the independent fraud claims, the court summarized its holding as 'narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies and which expose a plaintiff to liability for personal damages independent of the

1    plaintiff's economic loss.'" *Id.* at 1036 (quoting *Robinson*, 334 Cal. 4th at 993).

2        Numerous courts have found that negligent misrepresentation and fraud claims failed

3    under the economic loss rule in false advertising cases where the plaintiff alleged only economic

4    loss. *See, e.g.*, *McWhorter*, 2025 WL 948061, at *8; *Barrett v. Optimum Nutrition*, 2022 WL

5    2035959, at *4 (C.D. Cal. Jan. 12, 2022) (negligent misrepresentation and fraud); *Madrigal v.*

6    *Hint, Inc.*, No. CV1702095VAPJCX, 2017 WL 6940534, at *3 (C.D. Cal. Dec. 14, 2017)

7    (negligent misrepresentation); *Strumlauf*, 192 F. Supp. 3d at 1036 (negligent misrepresentation

8    claim). "Economic loss consists of damages for inadequate value, costs of repair and replacement

9    of the defective product or consequent loss of profits—without any claim of personal injury or

10   damages to other property." *Robinson*, 34 Cal. 4th at 988. Because Plaintiffs here have not

11   alleged any losses other than economic loss in connection with their fraud and negligent

12   misrepresentation claims, the Court concludes that those claims fail to state a claim under the

13   economic loss rule. Plaintiffs will be given leave to amend to allege, if they can, any non-

14   economic losses associated with these claims.

15   **IV.    CONCLUSION**

16       For the reasons stated above, the Motion is GRANTED as to Claims One and Four, which

17   are dismissed with leave to amend. The Court also GRANTS the Motion in part as to Claims

18   Two, Three and Five to the extent those claims are based on alleged omissions and dismisses those

19   claims with leave to amend. In all other respects, the Motion is DENIED. Plaintiffs' amended

20   complaint shall be filed by **January 7, 2026.**

21       **IT IS SO ORDERED.**

22   Dated: November 26, 2025

23   _____

24   JOSEPH C. SPERO
     United States Magistrate Judge

25

26

27

28

26